## CITY OF KINGFISHER et al. v. STATE INDUSTRIAL COM. et al.

No. 15780—Opinion Filed Dec. 8, 1925.

1. **Master and Servant — Workmen's Compensation Law — Questions of Fact — Finality of Award.**

Under the provisions of section 7294, C. S. 1921, the decision of the Industrial Commission as to the facts is final and binding upon this court in a proceeding to review it, if there is any competent evidence tending reasonably to support the same.

2. **Same—Permanent Partial Disability— Loss of Use of Eye.**

Under Workmen's Compensation Law, section 6, subd. 3, c. 246, Session Laws 1915, as amended by section 9, subd. 3, c. 14, Session Laws 1919, held, where the injured employe lost all practical use of an eye as a result of an injury, such employe is entitled to compensation irrespective of the ability of the employe to continue to perform his work in which he was engaged at the time of his injury. The test as to the rights of an injured employe to receive compensation is only dependent upon such employe having received an accidental personal injury resulting in such a permanent partial disability as is provided for in the schedule of the act. (Winona Oil Co. v. Smithson, 87 Okla. 226, 209 Pac. 398.)

(Syllabus by Threadgill, C.)

Commissioners' Opinion, Division No. 3.

Action by City of Kingfisher and Aetna Life Insurance Company, as petitioners, against the State Industrial Commission of the State of Oklahoma and Dan S. Riley, as respondents, to reverse and vacate an order of award made to Dan S. Riley. Award affirmed.

Ross & Thurman and Samuel J. Clay, for petitioners.

The Attorney General and E. M. Bradley, for respondents.

Opinion by THREADGILL, C. This is an action by the city of Kingfisher, a municipal corporation, and the Aetna Life Insurance Company, a corporation, as petitioners, against the State Industrial Commission and Dan S. Riley, as respondents, to review and reverse an order of award

made by the said Commission to said Dan S. Riley on August 27, 1924.

The essential facts in the case, as disclosed by the record, are substantially as follows: On June 29, 1923, while Dan S. Riley was in the employ of the city of Kingfisher as assistant engineer in the water works department, and while in the course of his employment filling a certain treating tank with boiler compound, soda, ash, and lime, used to prevent boiler corrosion, some of the mixture splashed out of the tank into his face and in his right eye and injured it, for which he applied to the Industrial Commission for compensation under section 7290, Comp. Stat. 1921. The Commission heard the evidence of claimant and other witnesses, and, on August 27, 1924, made an order finding that the injury was accidental and one arising out of, and in the course of, his employment while filling the treating tank with boiler compound, by the soda, ash, and lime splashing in his face and getting into his right eye, and—

"that as result of said accidental injury the claimant's vision of right eye is 20-120 and is hazy, which has caused a cloud in claimant's right eye and has the appearance of ground glass, which obstructs his vision, and as a result of said cloud claimant's vision in said eye is practically destroyed."

And thereupon the Commission awarded compensation for a period of 100 weeks at the rate of $10.81 per week, and for all medical expenses.

1. Petitioners' first contention is that there is no evidence reasonably tending to support the award of the Commission. This requires us to review the evidence as to the extent of the injury. The first witness to testify was the claimant himself. He states the mixture struck him in the face and got in his right eye, and it was "just like that much fire in my face." He applied to Dr. Pendleton at once for treatment, who gave him temporary relief and treated his eye thereafter. Before the accident he did not have to wear glasses to see, and since the accident "cannot see anything hardly out of the right eye." Has been of no service to him since it was hurt. He had Dr. Ferguson examine the eye in Oklahoma City in the presence of Dr. Pendleton. He gave him 50 per cent. disability, but stated that "the right eye was gone." He couldn't see out of his right eye, and the left eye had been impaired since the injury to the right eye. The court asked him if he could count his fingers with the right eye, and he answered he could at a short distance from him. He said he could

not read the ordinary newspaper with the right eye; could see the object of a man, but could not tell who it was; could see the object of his fingers at arm's length from his face. The doctors had treated him, but the sight in the right eye could not be restored. Dr. J. W. Pendleton testified that he treated the claimant from the first; that the eye was injured by a burn on the cornea. This was the clear part of the eye. The effect of the injury was to produce a scar which had become opaque, "and the opacity over this is such that he cannot see straight; can see down and above." "The opacity is right in front of the pupil, very hard to see—only by refracted light, and by magnifying lense—it is smokey, causing a cloudiness right in front of the pupil. I figure the eye was 75 per cent. disabled." Further stated that the impairment of the right eye had weakened the left by throwing on it double work. Said he was with claimant when Dr. Ferguson examined him, and Dr. Ferguson stated at the time that he figured about 50 per cent. loss to be permanent. In answer to a question by the court as to his vision being 22/100 he stated:

"That is what I gave and what Dr. Ferguson gave him. Large type letters at 20 feet, he could distinguish them but was not accurate. It's blurred." Question by the Court: "Q. About ten per cent. vision, is it? A. No, sir; worse than that. I couldn't figure it that way. It is worse than any ten per cent. That is awful poor vision. Q. Then if he had a vision of 22/100 at this time, about 30 days ago, that is all he had? A. It's about the same at present. Dr. Ferguson said that he got the same test. Could distinguish clearly at 20 feet. Q. What is the vision of the left eye? A. About 20/40, something like that. I don't recall testing his left eye for distance."

On cross-examination he stated that if Dr. Ferguson gave him a vision of 20/120, that this means that he could see the distance of 120 feet perfectly at that time; that he did not understand this sort of percentage figuring. He further stated that Dr. Ferguson told him that the tests for 22/100, he had dim vision, and gave him 50 per cent. vision, but said he couldn't do that; said he and Dr. Ferguson did not agree.

Dr. Guthrie testified that he had examined the claimant's eye and found "the cornea had been injured, leaving an opacity or scar which obstructs his vision, the vision being 20/120 and hazy and the left eye 20/30; improved with glasses, is corrected to 20/20." He said a scar originating on

the cornea of the clear part of the eye caused a cloud, has the appearance of ground glass; it may be the result of any kind of injury to the cornea, like looking through ground glass which obstructs the vision.

"Q. Has he any particular use of his eye? A. 20/120 vision gives him some particular use of the eye. Q. Because of the eye being hazy, does that reduce his practical vision beyond 120ths? A. Yes, sir; that is what causes the haziness. Q. Is he able to read with the eye? A. No, sir. Q. Is he able to tell people on the street with that eye? A. I should think so, although I am not positive. Q. Would he be able to tell a man's face on the street that he was well acquainted with? A. I rather think so. Because the haziness does not cover the entire front part of the eye, I think he could do that. Q. Is he able to use the eye at any work, at a bench? A. It would have to be very coarse work. Q. Would he be able to file or drive a nail or things of that sort. A. I don't believe so."

The witness then stated that he figured a loss of vision to the claimant of 50 per cent., according to his examination and "the table." The court asked:

"Q. Would he be able to tell the oil cups on an engine; would he be safe to work on an engine? A. I don't believe so."

Dr. E. S. Ferguson testified that he examined the injury in January, 1924, and at that time "vision in the right eye was 20/120, hazy; glasses improved blindness some, but no particular correction in vision. His injury was followed by inflammation; the lids were normal. Across the cornea was an opacity or cloudiness interfering with vision. The opacity in my opinion would be permanent. The rest of the eye was normal." Further stated, he again examined the eye in June, 1924, and it was practically in the same condition as in January. He said vision of 20/120 was about "50 per cent. loss." He could see ordinary tools, but the vision would be hazy. He would be safe in crossing the street, but would have to be careful with that hazy eye. He would not be able to see and read the oil gauge with that eye alone. The court asked him:

"Q. For all practical purposes the eye is about lost, is it not? A. Not much use to him. Any fine work, he could not do that, in his present condition, with that eye alone."

This is a synopsis of the evidence as to the injury of the eye, and we have not deemed it necessary to give any other evidence as to other issues, as they are not contested here.

It will be observed that very much of the expert evidence in the case was conflicting, inconsistent, and unintelligent. Dr. Pendleton could not agree with Dr. Ferguson as to the percentage in the loss of vision. He admitted that he did agree with him when the examination was made in January, 1924, and at that time they "figured he could do 50 per cent. vision with that eye," but he further stated that he figured the eye was about 75 per cent. disabled. He said he gave the eye 22/100 and that Dr. Ferguson also gave this—

"Large type letters at 20 feet he could distinguish them, but was not accurate; it's blurred. Q. About ten per cent. vision, is it? A. Worse than that. Q. He has only 10 per cent. vision, 22/100? A. No, sir; I couldn't figure it that way. It is worse than any 10 per cent. That is awful poor vision."

Dr. Ferguson said the eye had 50 per cent. vision, but hazy, and fixed the percentage at 20/120. There is no satisfactory explanation as to what these figures mean. Whatever 22/100 represents, Dr. Pendleton said the vision was worse than 10 per cent. vision, and whatever 20/120 represents, as fixed by Dr. Ferguson, the vision was 50 per cent, but hazy. Dr. Pendleton said, at another place in his testimony, that Dr. Ferguson told him that he gave him 50 per cent.—"I said I couldn't do that." He was asked:

"Q. Your ideas are not with him? A. Well, people differ. Dr. Ferguson said if anybody wanted anything from his office to call him. Q. You stated that he said he had 50 per cent. vision? A. He said he was going to put it that, he could distinguish figures good 50 per cent. vision."

Dr. Guthrie's testimony is equally confusing. He fixed the vision of the eye at 20/120, the same as Dr. Ferguson, and stated that the left eye was 20/30 and, with glasses, improved to 20/20, which, as we know, is equal to one, or 100 per cent., or perfect. There is no other explanation of the figures used. By the same rule applied to the figures of the right eye, the 20/120 would be equal to 1/6 vision, which would be far less than 50 per cent., and inconsistent with the testimony that the vision was 50 per cent. Dr. Pendleton tried to explain the figures 20/120 and stated that this meant he could see clearly at 120 feet away, but admitted he did not understand this rule. He figured by a different table. Now, what definite understanding could the Commission get from the figures used and evidence of these learned men? Expert testimony should serve the purpose of making clearer

to the ordinary mind facts that are obscure and understood only by scientific study, skill, and experience, and such testimony should be definite and certain and explanatory of the point under consideration. The Commission adopted the figures 20/120, in the order, in fixing the award, and, if it meant anything to them, it must appear in the words "hazy" and "ground glass" and "cloud," which they say obstructed the vision and practically destroyed the sight.

However, there is this much which is certain from the testimony of the expert witnesses, that the accidental burn produced a scar on the cornea of claimant's eyesight, in front of the pupil, and this scar was opaque, that is, not transparent. It did not result in darkness to the sense of vision, but a haziness, as seen through ground glass, and this haziness obstructed the vision. According to the claimant's testimony, he could hardly see anything, and the eye was of no use to him. He could see the bulk of a man, but could not discern who it was. Could see the bulk of the fingers or hand at arm's length from his face, but it was not a discerning vision, but one of shadows, and this was in accord with the physicians' evidence, who described the vision as looking through ground glass, a haziness, not any sort of haziness, but a ground glass haziness, which was permanent. The Commission had the witnesses before them, heard the evidence on the witness stand, and concluded that the vision of claimant's right eye was practically destroyed, and fixed the amount of the award at $10.81 per week for 100 weeks and all medical expenses, and we are forced to the conclusion that there is competent evidence in the record reasonably tending to support the order of the Commission. Rawlerson v. Industrial Commission, 76 Okla. 8, 183 Pac. 880.

2. Petitioners' second proposition is that, notwithstanding the fact that there is a partial permanent impairment of the sight of the eye, this condition did not, according to law, or any of the testimony, show that the claimant's ability to earn money or to engage in the same occupation that he was engaged in at the time of the accident was depreciated in the least. This proposition is based upon the fact that the evidence shows that the claimant continued in the employment of the city as assistant engineer from the time of the injury, and there was evidence tending to show that he could continue to do this sort of work and earn the same wages he did before the accident. The cases cited to support the proposition are International Harvester Co. v. Industrial Commission, 157 Wis. 167, and Hirschkorn v. Fiege Desk Co. et al. (Mich.) 150 N. W. 851, but these cases do not furnish us the law applicable to the instant case. The law governing the fact of the injury and the amount of the award is 3rd subdivision of section 7290, Comp. Stat. 1921. The question as to earning capacity raised by petitioners' second proposition is governed by the case of Winona Oil Co. v. Smithson, 87 Okla. 226, 209 Pac. 398, and the rule stated is as follows:

"Under Workmen's Compensation Law, section 6, subd. 3, c. 246, Session Laws 1915, as amended by section 9, subd. 3, c. 14, Session Laws 1919, held, where the injured employe lost all practical use of an eye as a result of an injury, such employe is entitled to compensation irrespective of the ability of the employe to continue to perform his work in which he was engaged at the time of his injury. The test as to the rights of an injured employe to receive compensation is only dependent upon such employe having received an accidental personal injury resulting in such a permanent partial disability as is provided for in the schedule of the "act."

We are, therefore, of the opinion that the order of the Industrial Commission should be affirmed.

By the Court: It is so ordered.

Note. — See under (1) Workmen's Compensation Acts, C. J. p. 12, § 127: anno. L. R. A. 1916A. pp. 163, 266: L. R. A. 1917D, 186; 28 R. C. L. pp. 827. 828: 3 R. C. L. Supp. p. 1600; 4 R. C. L. Supp. p. 1872; 5 R. C. L. Supp. p. 1581. (2) Workmen's Compensation Acts, C. J. pp. 95. § 84; 9b, § 88; 8 A. L. R. 1324; 24 A. L. R. 1466; 28 R. C. L. p. 821; 4 R. C. L. Supp. p. 1867; 5 R. C. L. Supp. 1577.